IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LINDA D. CRAWFORD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FRANKLIN CREDIT MANAGEMENT | : | 08-CV-6293 (KMW-FM) |
| CORPORATION, TRIBECA LENDING | : | |
| CORP., LENDERS FIRST CHOICE AGENCY | : | |
| INC., | : | |
| | : | |
| Defendants. | : | |

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT STAN V. SMITH

---

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 665-8500

*Attorneys for Defendants*
*Franklin Credit Management Corporation*
*and Tribeca Lending Corp.*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 1

    A.    Reduction in Value of Life ..................................................................... 1

    B.    Loss of Earnings .................................................................................... 2

    C.    Value of Time Spent on Situation.......................................................... 3

    D.    Additional Interest on Car Loan ............................................................ 4

    E.    Loss of Credit Expectancy ..................................................................... 4

III.    ARGUMENT ...................................................................................................... 5

    A.    Mr. Smith's Testimony Is Irrelevant Because Plaintiff May Not Recover
The Claimed Damages On Which He Intends To Opine....................... 6

    B.    Mr. Smith's Opinion Fails To Meet The Requirements Of Federal Rule Of
Evidence 702 ........................................................................................ 6

        1.    Mr. Smith's Opinion On Hedonic Damages Should Be Excluded
For Multiple Reasons ................................................................. 7

        2.    Mr. Smith's Opinion On Lost Wages Is Based On Unrealistic
Assumptions.............................................................................. 18

        3.    There Is No Basis For Mr. Smith's Opinion That Plaintiff Is
Entitled To Compensation For The Time She Spent On This Case ........ 20

        4.    Also Unrealistic Is Mr. Smith's Opinion Based On The Alleged
Damage To Plaintiff's Credit.................................................... 20

IV.    CONCLUSION.................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anastasion v. Credit Serv. of Logan, Inc.*,
   No. 2:08 Civ. 180 (TS), 2011 WL 4826102 (D. Utah Oct. 5, 2011) .................................12, 20

*Anderson v. Nebraska Dep't of Social Servs.*,
   248 Neb. 651, 538 N.W.2d 732 (1995).....................................................................11, 15, 17

*Ayers v. Robinson*,
   887 F. Supp. 1049 (N.D. Ill. 1995) ...............................................................................13, 18

*Baker v. Urban Outfitters, Inc.*,
   254 F.Supp.2d 346 (S.D.N.Y. 2003).....................................................................................9

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996)..........................................................................................6, 9, 18

*Brunker v. Schwan's Home Service, Inc.*,
   2006 WL 5186489 (N.D. Ind. Oct. 23, 2006).......................................................................19

*Carroll v. United States*,
   295 Fed.Appx. 382 (2d Cir. Oct. 2, 2008) .......................................................................7, 19

*Crespo v. City of Chicago*,
   No. 96 Civ. 2787, 1997 WL 537343 (N.D. Ill. Aug. 22, 1997)........................................14, 16

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................6, 8,12, 13, 17

*Emig v. Electrolux Home Prods. Inc.*,
   No. 06 Civ. 4791 (KMK), 2008 WL 4200988 (S.D.N.Y. 2008) .............................................8

*Estate of DuBose v. City of San Diego*,
   2002 WL 34408963 (S.D. Cal. Oct. 1, 2002) .........................................................12, 14, 18

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).........................................................................................................9

*Hein v. Merck & Co.*,
   868 F. Supp. 230 (M.D. Tenn. 1994)................................................................11, 12, 14, 15

*Joy v. Bell Helicopter Textron, Inc.*,
   999 F.2d 549 (D.C. Cir. 1993)............................................................................................19

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
   No. 06 Civ. 550 (JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)....................................17

ii

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)...................................................................................................8

*Kurncz v. Honda North Am., Inc.*,
    166 F.R.D. 386 (W.D. Mich. 1996) ............................................... 12, 13-14, 15, 18

*Lee v. City of Richmond, Va.*,
    No. 3:12 Civ. 471, 2014 WL 5092715 ...................................................................19

*Loth v. Truck-A-Way Corp.*,
    70 Cal Rptr.2d 571 (Cal. App. 1998).......................................................7,11, 17

*Lujan v. Cooper Tire & Rubber Co.*,
    No. 06 Civ. 173 (RHS)(KBM), 2008 WL 7489095 (D. N.M. Jun. 13, 2008)........9, 13, 15, 16

*McDougald v. Garber*,
    73 N.Y.2d 246, 536 N.E.2d 372 (1989)..................................................................7

*McGuire v. City of Santa Fe*,
    954 F. Supp. 230 (D. N.M. 1996) ..........................................................................15

*Mercado v. Ahmed*,
    974 F.2d 863 (7th Cir. 1992) ...................................................................10, 15, 17

*Montalvo v. Lapez*,
    77 Hawaii 282, 884 P.2d 345 (1994) ........................................................11, 12, 16

*Saia v. Sears Roebuck & Co.*,
    47 F. Supp.2d 141 (D. Mass. 1999) ..........................................11, 12, 14, 15, 16

*Smith v. Jenkins*,
    732 F.3d 51 (1st Cir. 2013)......................................................1, 9, 11, 12, 20

*Soley v. Wasserman*,
    No. 08 Civ. 9262 (KMW)(FM), 2013 WL 3185555 (S.D.N.Y. Jun. 21, 2013) ......................5

*Stokes v. John Deere Seeding Group*,
    No. 4:12 Civ. 04054 (SLD)(JAG), 2014 WL 675820 (C.D. Ill. Feb. 21, 2014)....9, 13, 14, 15, 16

*Sullivan v. United States Gypsum Co.*,
    862 F. Supp. 317 (D. Kan. 1994)........................................................7, 12, 17

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994)........................................................................16

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999)....................................................................16

*Wilt v. Buracker*,
    443 S.E.2d 196 (W. Va. 1991) ..........................................................................................11, 12

**STATUTES**

Fair Credit Reporting Act ...........................................................................................................13

**OTHER AUTHORITIES**

Fed. R. Evid. Rule 104 .................................................................................................................5

Fed. R. Evid. Rule 403 ..........................................................................................................17, 18

Fed. R. Evid. Rule 702 ....................................................................... 1, 6, 7, 8, 15-16, 18

Defendants Franklin Credit Management Corporation and Tribeca Lending Corporation ("Tribeca"), by their undersigned counsel, respectfully submit this memorandum of law in support of their motion to preclude the testimony of Plaintiff's proposed expert Stan V. Smith.

## I.      INTRODUCTION

Plaintiff intends to offer economist Stan V. Smith as a purported damages expert. Mr. Smith's testimony should be excluded because, as discussed in one of Defendants' other pending motions *in limine*, none of the types of damages sought by Plaintiff are recoverable on her common law fraud claim, and Mr. Smith's testimony would therefore be irrelevant.[1]

In addition, even if such damages were recoverable in fraud, Mr. Smith's opinions do not meet the standards for admissibility under Federal Rule of Evidence 702.  In fact, Mr. Smith's opinions have been repeatedly excluded by courts around the country as unreliable, not helpful to the jury, and lacking in a sufficient evidentiary foundation.  The same is true in this case.

## II.     BACKGROUND

In his report, Mr. Smith sets forth several categories of claimed damages.

### A.      Reduction in Value of Life

Mr. Smith opines that Plaintiff has experienced damages in the form of "Reduction in Value of Life," sometimes referred to as "hedonic damages."  (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 171:15-18)).  Mr. Smith asserts that hedonic damages are

---

[1]      Aside from her fraud claim, Plaintiff's only other remaining claims in this action are asserted under the federal Truth-in-Lending Act ("TILA").  In still another separate motion *in limine*, Defendants are moving to preclude Plaintiff from presenting evidence in support of her TILA claims because those claims are legally defective.

premised on the assumption that life is valued at more than lost earnings capacity.  (Bryce Decl., Exh. 9 (S. Smith Rep. p. 8)).

To place a dollar figure on the value of a life, Mr. Smith uses a model called "willingness to pay" – *i.e.*, "what we, as a contemporary society, actually pay to preserve the ability to lead a normal life.  The studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies."  (*Id.* at 8).  More specifically, the studies examine (1) consumer behavior and purchases of safety devices, (2) wage risk premium to workers, and (3) cost-benefit analysis of regulations.  (*Id.* at 9).  The numerical value of a life in such studies is obtained by dividing the cost of whatever safety device, incremental pay increase, etc. is being examined, by the probability of actual occurrence of the dangerous event to which the person would be exposed.  (*Id.*).  Based on his evaluation of such studies, Mr. Smith concludes that the value of the life of an average person is $4.1 million.  (*Id.* at 10; Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 168:14-170:8)).

In his report, Mr. Smith then assumes a range of percentages by which Plaintiff's life has been impaired for each year since the underlying alleged events in this case, and projects such impairment rates into the future for each year remaining in Plaintiff's estimated life span.  (Bryce Decl., Exh. 7 (S. Smith Rep. pp. 9-10)).  Based on this formula, Mr. Smith calculates the present value of the total impairment to Plaintiff's life at $616,575 to $1,208,647, averaging $912,611.  (*Id.* at 10).

## B.    Loss of Earnings

Mr. Smith sets forth a category for "Loss of Wages and Employee Benefits."  The premise of this category is that the financial problems and stress that Plaintiff allegedly experienced as a result of Defendants' alleged conduct caused Plaintiff not to graduate medical

2

school and pass the medical boards on-time, and not to become a practicing physician in New York by 2007, as she had planned. (*Id.* at 7-8). Mr. Smith assumes that, as a result of Defendants' alleged conduct, Plaintiff would experience a three-year delay in becoming a practicing physician. (*Id.*). Based on various sets of statistics reflecting the average earnings for physicians in the United States, Mr. Smith opines that the alleged delay in Plaintiff's career path resulted in a net loss of earnings in the amount of $382,382, assuming a retirement age of 72. (*Id.* at 6-8).

Mr. Smith admitted at deposition that he did not take into consideration how many recent graduates from Plaintiff's particular medical school (located in the Dominican Republic) actually were able to obtain positions practicing medicine in the United States, or New York in particular (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 49:16-23, 51:6-18, 52:7-11)), or how many medical school graduates Plaintiff's age (57, at the time of Mr. Smith's deposition in 2010) found such employment. (*Id.* at Tr. 52:18-22). Mr. Smith also did not take into account Plaintiff's grades in medical school (*id.* at Tr. 48:19-50:1), which Plaintiff testified were "average." (Bryce Decl., Exh. 5 (L. Crawford Dep., May 17, 2010, Tr. 31:17-18)). Mr. Smith also did not consider the fact that Plaintiff already had failed her medical boards as of the time of his deposition in 2010. (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 52:23-53:18)). At her most recent deposition in this case taken a few months ago, Plaintiff testified that she still is not a practicing physician, and has now taken various parts of her medical boards several times and has failed each part each time. (Bryce Decl., Exh. 6 (L. Crawford Dep., Oct. 29, 2014, Tr. 36:5-39:24)).

### C.   Value of Time Spent on Situation

Mr. Smith also includes a component of damages for the alleged value of Plaintiff's "time spent trying to resolve this situation." (Bryce Decl., Exh. 9 (S. Smith Rep. p.

4)).  He includes within this category the alleged value of the time Plaintiff reported she spent contacting Defendants and other agencies to try to refinance her Tribeca loan, and the time she spent doing research, applying for loans, communicating with her attorneys, appearing in court, and attending depositions, court hearings and other meetings.  (*Id.* at 4-6).  Mr. Smith assumes a rate of payment for this time at the average of the mean hourly rate of bookkeeping, auditing and accounting clerks, and the mean hourly rate of executive secretaries and administrative assistants.  (*Id.* at 5).  Based on this assumption, he estimates loss for this category in the amount of $29,563.  (*Id.* at 6).

### D. Additional Interest on Car Loan

It is undisputed that, at the time Plaintiff began having dealings with Tribeca in late 2004, she had filed bankruptcy earlier that year, was in default on two mortgage loans, and was a defendant in a pending foreclosure action.  (Bryce Decl., Exh. 5 (L. Crawford Dep., Apr. 17, 2009, Tr. 8:16-18:19)).

Despite these facts, and despite never having spoken to any lender on the topic (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 105:1-6)), Mr. Smith estimates that, but for Defendants' alleged conduct and its alleged impact on Plaintiff's credit rating, Plaintiff would have qualified for a less expensive car loan (at an 8% interest rate) than a car loan she actually obtained in May 2009.  (Bryce Decl., Exh. 7 (S. Smith Rep. p. 3)).  He concludes that the present value of the total additional amount Plaintiff will pay on the car loan is $10,215, and he includes this amount as claimed damages.  (*Id.*).

### E. Loss of Credit Expectancy

Mr. Smith also includes a category of claimed damages called "Loss of Credit Expectancy."  In support of this theory, Mr. Smith assumes that, but for Defendants' alleged conduct, Plaintiff would have had the ability to borrow $10,000 at a lower rate (12%) than the

4

rate at which she actually could borrow (25%). (*Id.* at 3-4). Once again, Mr. Smith admitted at deposition that he had not spoken with any lender to determine whether – given Plaintiff's bankruptcy and credit history as of the time she began to deal with Tribeca in 2004 – she would have qualified for a loan of $10,000 at a 12% rate. (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 125:8-126:13)).

In any event, according to Mr. Smith, the "loss of credit expectancy" theory posits that Plaintiff's alleged ability to borrow this hypothetical $10,000 at a lower rate had value, even if such borrowing never actually occurred. (Bryce Decl., Exh. 9 (S. Smith Rep. pp. 3-4)). Mr. Smith estimates the "loss of credit expectancy" at $61,050. (*Id.* at 4).[2]

## III.   ARGUMENT

"'A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine.'" *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW)(FM), 2013 WL 3185555, at *3 (S.D.N.Y. Jun. 21, 2013) (quoting *Carofino v. Forester,* 450 F.Supp.2d 257, 270 (S.D.N.Y. 2006) (citing *Luce v. United States,* 469 U.S. 38, 41 n.4 (1984)). "Where such a motion requests that certain evidence be precluded, the court must 'make a preliminary determination on the admissibility of the evidence under *Rule 104 of the Federal Rules of Evidence.*'" *Id.* (quoting *Allen v. City of New York,* 466 F.Supp.2d 545, 547 (S.D.N.Y. 2006) (citation omitted)).

---

[2]      As an offset to Plaintiff's total claimed damages, Mr. Smith attempts to estimate the "present value of a reasonable mortgage at the rates and terms [allegedly] initially offered to Ms. Crawford" by Tribeca in 2004. (Bryce Decl., Exh. 9 (S. Smith Rep. pp. 2-3)). Mr. Smith values the cost of this hypothetical mortgage at $642,229 (*id.* at 3), but once again Mr. Smith did not take into account any aspect of Plaintiff's then-existing credit history in opining that Plaintiff could have obtained such a mortgage at this cost. (Bryce Decl., Exh. 8 (S. Smith Dep., Mar. 30, 2010, Tr. 63:11-73:25)). Obviously, the cost of the mortgage would have risen if the lender viewed Plaintiff as a riskier borrower, and the amount of Mr. Smith's offset would have to be higher.

**A.** **Mr. Smith's Testimony Is Irrelevant Because Plaintiff May Not Recover The Claimed Damages On Which He Intends To Opine**

As detailed in one of Defendants' other pending motions in limine, every category of Plaintiff's claimed damages – including those on which Mr. Smith opines – are unrecoverable per the "out of pocket" rule applicable to fraud claims under New York law.  Because the claimed damages on which Mr. Smith opines are legally unrecoverable, Mr. Smith's testimony would be irrelevant, and should be excluded for that reason alone.

**B.** **Mr. Smith's Opinion Fails To Meet The Requirements Of Federal Rule Of Evidence 702**

Federal Rule of Evidence 702 permits expert testimony if it would (1) "help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based upon sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

District courts have a "gatekeeping" role with respect to expert opinion testimony, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and have broad discretion in the matter of the admission or exclusion of expert evidence.  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).  A party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements under Federal Rule of Evidence 702 are met.  *Daubert*, 509 U.S. at 593 n.10.

On each area of Plaintiff's claimed damages, Mr. Smith's opinion fails to meet one or more of the requirements of Rule 702.

1. **Mr. Smith's Opinion On Hedonic Damages Should Be Excluded For Multiple Reasons**

   a. **New York Law Prohibits A Separate Award For Hedonic Damages, And Mr. Smith's Attempt To Separately Quantify Such Alleged Damages Is Therefore Improper**

Before even turning to the requirements of Rule 702, there is a more fundamental ground for exclusion of Mr. Smith's opinion on hedonic damages.  In *McDougald v. Garber*, 73 N.Y.2d 246, 536 N.E.2d 372 (1989), the New York Court of Appeals clearly held that hedonic damages may be recovered only as part of a general award for pain and suffering, and that there can be no separate award for hedonic damages.  73 N.Y.2d at 256-57.  A separate award of hedonic damages, the Court of Appeals explained, would risk double-counting such damages. *Id.* at 254-56.  *Accord Carroll v. United States*, 295 Fed.Appx. 382, 386 (2d Cir. Oct. 2, 2008) ("the district court did not err in failing to award damages for loss of enjoyment of life because New York does not permit such an award separate from the pain and suffering award.")

Mr. Smith's attempt to separately quantify Plaintiff's alleged hedonic damages – a single component of her alleged non-pecuniary losses – conflicts with the Court of Appeals' holding in *McDougald* that there may be no separate hedonic damages award.

In fact, courts in other jurisdictions have excluded Mr. Smith's testimony on precisely this ground – *i.e.*, that the jurisdiction – like New York – prohibits a separate award of hedonic damages.  *See, e.g.*, *Loth v. Truck-A-Way Corp.*, 70 Cal Rptr.2d 571, 577 (Cal. App. 1998) (holding that Mr. Smith's testimony on hedonic damages was inadmissible because, among other reasons, California law permits hedonic damages only as part of general damage award for pain and suffering, and not as separately calculated award); *Sullivan v. United States Gypsum Co.*, 862 F. Supp. 317, 320 (D. Kan. 1994) (excluding Mr. Smith's testimony because, among other reasons, "Kansas law does not provide a separate and distinct category of damages

for loss of enjoyment of life.  Rather, the Kansas Supreme Court has stated that 'loss of enjoyment of the pleasurable things in life is inextricably included within the more traditional area of damages for disability for pain and suffering.'") (quoting *Gregory v. Carey*, 246 Kan. 504, 513, 791 P.2d 1329 (1990)).

Likewise here, Mr. Smith's opinion on hedonic damages should be excluded for this reason.

### b.    Mr. Smith's Opinion On Hedonic Damages Is Unreliable

A separate and independent ground for exclusion of Mr. Smith's opinion on hedonic damages is that his opinion is unreliable under Rule 702.  Under Rule 702, the Court must determine whether proffered expert testimony "rests on a reliable foundation."  *Daubert*, 509 U.S. at 597.  To assist courts in making this determination, the Supreme Court has identified the following factors to consider when determining the reliability of the methodology used by a proffered expert: "(1) whether the theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique has been met with widespread acceptance."  *Emig v. Electrolux Home Prods. Inc.,* No. 06 Civ. 4791 (KMK), 2008 WL 4200988, *6 (S.D.N.Y. 2008) (citing *Daubert,* 509 U.S. at 593–94).  The Rule 702 inquiry is "a flexible one," *Daubert,* 509 U.S. at 594, and while "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned[,] . . . [the] list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (emphasis in original).  The primary objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

8

"[E]xpert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" *Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 353 (S.D.N.Y. 2003) (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996)).  Where the expert's testimony is "connected to existing data only by the *ipse dixit* of the expert," the court may determine that there is an insufficient analytical connection between the opinion offered and the supporting facts to warrant admission of the expert's opinion.  *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Turning back to Mr. Smith's opinion, the First Circuit Court of Appeals recently observed that "the overwhelming majority of courts have concluded that [Mr. Smith's] 'willingness to pay' method is either unreliable or not likely to assist the jury in valuing hedonic damages, or both."  *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013) (citing cases).  Other federal courts have recently made the same observation.  *See, e.g.*, *Lujan v. Cooper Tire & Rubber Co.*, No. 06 Civ. 173 (RHS)(KBM), 2008 WL 7489095, at *2 (D. N.M. Jun. 13, 2008) (noting that "the weight of authority" has "reject[ed] expert testimony that attempts to quantify hedonic damages as unreliable, untestable, and failing to meet the requirement of general acceptability."); *Stokes v. John Deere Seeding Group*, No. 4:12 Civ. 04054 (SLD)(JAG), 2014 WL 675820, at *3 (C.D. Ill. Feb. 21, 2014) ("the weight of mandatory and persuasive precedent counsels strongly against admitting Dr. Smith's [expert] testimony.").

As discussed below, this Court should reach the same conclusion.

### (1)    Mr. Smith's Willingness-To-Pay Approach Does Not Reliably Measure The Enjoyment Of A Plaintiff's Life

A principal criticism of Mr. Smith's "willingness-to-pay" approach has been that it is highly questionable whether the studies relied on by Mr. Smith actually measure the value of

life.  As courts have observed, the subject matter of the studies on which Mr. Smith's opinions

are based – consumer purchases, job choices, and enactment of government regulations – involve

a whole host of considerations other than value of life.  As the Seventh Circuit has explained:

> [W]e have serious doubts about [Mr. Smith's] assertion that the studies he relies upon actually measure how much Americans value life.  For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth.  Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them.  More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce risk, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking."  Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.

*Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992).  The Seventh Circuit in *Mercado*

continued:

> The two other kinds of studies Smith relies upon are open to valid and logical criticism as well.  To say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives.  For example, someone who believes police officers working in an extremely dangerous city are grossly undercompensated for the risks they assume might nevertheless take up the badge out of a sense of civic duty to their hometown. Finally, government calculations about how much to spend (or force others to spend) on health and safety regulations are motivated by a host of considerations other than the value of life: is it an election year?  how large is the budget deficit?  on which constituents will the burden of the regulations fall?  what influence and pressure have lobbyists brought to bear?  what is the view of interested constituents?  And so on.

*Id.* Numerous other courts have made substantially the same observations about the assumptions underlying Mr. Smith's hedonic damages approach.[3]

Courts have also criticized the willingness-to-pay methodology because – even if it could be used to value life at all – it would measure only the value of "anonymous" lives, and not the life of the particular plaintiff. *Hein*, 868 F. Supp. at 233 ("Dr. Palfin bases his valuation on the loss in this case as in any other case on 'anonymous lives.' Such a generic view may be appropriate for a governmental agency's cost-benefit analysis of a proposed regulation, for instance. However, it seems a rather callous and unhelpful perspective when the issue before the factfinder is loss of enjoyment of life of a particular individual. It seems obvious to this Court that some people enjoy life more than others. Attitudes, tastes, and psychological makeup, among many other possible factors, would affect one's hedonic potential."); *Loth*., 70 Cal Rptr.2d at 578 ("The figures Smith included in his baseline calculation have nothing to do with this particular plaintiff's injuries, conditions, hobbies, skills, or other factors relevant to her loss

---

[3]    *See, e.g.*, *Smith*, 732 F.3d at 66 ("We share the concerns of those courts that have excluded expert testimony based on the 'willingness-to-pay' methodology as lacking in reliability. . . . [W]e have serious doubts that the underlying studies actually measure the value of life."); *Saia v. Sears Roebuck & Co.*, 47 F. Supp.2d 141, 148 (D. Mass. 1999) ("The court finds it too large a leap to accept that the amount that individuals are willing to pay to reduce the probability of death accurately reflects the value society places on the average human life."); *Hein v. Merck & Co.*, 868 F. Supp. 230, 234 (M.D. Tenn. 1994) (assumptions underlying willingness-to-pay theory "are subject to serious questions"); *Montalvo v. Lapez*, 77 Hawaii 282, 303, 884 P.2d 345, 366 (1994) ("we agree with other courts that *assumptions* made in willingness-to-pay studies are questionable"); *Wilt v. Buracker*, 443 S.E.2d 196, 205 (W. Va. 1991) (willingness-to-pay studies "are based on assumptions that appear to controvert logic and good sense"); *Anderson v. Nebraska Dep't of Social Servs.*, 248 Neb. 651, 665-66, 538 N.W.2d 732, 742 (1995) (under "willingness to pay" approach, "[t]hree different models are used to arrive at the value of life: (1) consumer purchases of safety devices, (2) wage risk premiums to workers, and (3) cost-benefit analyses of governmental regulations. There are critical errors in all three models used to arrive at hedonic valuation."); *Loth v. Truck-A-Way Corp.*, 70 Cal Rptr.2d 571, 577 (Cal. App. 1998) ("It is speculative, at best, to say the amount society is willing to spend on seat belts or air bags has any relationship to the intrinsic value of a person's life").

11

of enjoyment of life"); *Kurncz v. Honda North Am., Inc.*, 166 F.R.D. 386, 390 (W.D. Mich.

1996) ("The 'willingness to pay' theory establishes a statistical value based on anonymous lives.

While the statistical approach may be useful for writing regulations, courts have found it rather

'callous and unhelpful' for jurors assessing individual lives.") (quoting *Hein*, 868 F. Supp. at

233); *Estate of DuBose v. City of San Diego*, 2002 WL 34408963, at *2 (S.D. Cal. Oct. 1, 2002)

("The value of DuBose's life depends on his particular facts (including health, history,

relationships, career, etc.), but this expert gives a range spanning six million dollars that

purportedly applies to 'all' individuals."); *Saia*, 47 F. Supp.2d at 150 ("'anonymous life values,

like those derived from hedonic damages estimates, have no bearing whatsoever on the

enjoyment of life lost by the victim.'") (quoting Joseph A. Kupier, *The Courts, Daubert, and

Willingness-To-Pay: The Doubtful Future of Hedonic Damages Testimony under the Federal

Rules of Evidence*, 1996 U. ILL. L.REV. 1197, 1243).

        Courts have also noted that, even if willingness-to-pay studies reliably measured

the value of life, value of life is not the same as value of **enjoyment of** life.  *Wilt*, 443 S.E.2d at

205 n.15 ("The willingness-to-pay studies do not relate in any way to the actual component of

damages, the *enjoyment* of life") (emphasis in original); *Smith*, 732 F.3d at 67 (same); *Montalvo*,

884 P.2d at 366 ("value of life itself is, at most, tangentially related" to valuing loss of enjoyment

of life); *Sullivan*, 862 F. Supp. at 321 ("The court's concern is that the willingness-to-pay studies

upon which Mr. Smith's calculations are based have no apparent relevance to the particular loss

of enjoyment of life suffered by a plaintiff due to an injury or death.").

        The willingness-to-pay methodology is an even poorer fit in cases – like the

instant case – that do not involve death or personal injury.  *Anastasion v. Credit Serv. of Logan,

Inc.*, No. 2:08 Civ. 180 (TS), 2011 WL 4826102, at *1 (D. Utah Oct. 5, 2011) (excluding Dr.

Smith's testimony regarding hedonic damages in case alleging federal Fair Credit Reporting Act claim and related claims, reasoning that "hedonic damages are used to approximate the loss of the value of life, and therefore are used in cases involving death or injury. . . .  As Plaintiff has not suffered the loss of life or limb, testimony regarding hedonic damages will not assist the trier of fact.").

In addition, courts have criticized Mr. Smith's selection of a benchmark value of life – such as his value in this case of $4.1 million per average life –as subjective and unscientific.  *Stokes*, 2014 WL 675820, at *4 (selection of value of life benchmark "amid the range presented by the various meta-analyses" was "unscientific 'eye-balling,'" and "was not made more reliable by Dr. Smith's 'conservative' choice of a lower-range figure."); *Ayers v. Robinson*, 887 F. Supp. 1049, 1060 (N.D. Ill. 1995) (determining range for valuation of life constitutes "eyeballing," which "may have the advantage of ease, but it surely lacks scientific reliability in the sense of producing consistent results. . . .  Anyone can look at the same range and come up with a different figure. . . .  [A] conservative opinion . . . does not equate to a scientific one") (internal citation omitted).

### (2)      Mr. Smith's Approach Fares No Better Under The *Daubert* Factors

A number of courts also have concluded that the willingness-to-pay theory for valuing hedonic damages does not pass muster under the *Daubert* factors.  Thus, several courts have held that the theory is not testable.  *Lujan*, 2008 WL 7489095, at *3 ("nothing indicates that [expert's willingness-to-pay] theory is testable; the studies on which he bases his testimony produce values ranging from $6.1 million to $12.9 million, suggesting very broad and flexible parameters."); *Kurncz*, 166 F.R.D. at 389 ("Some predictions or assumptions of economists can be validated at least in retrospect; *e.g.,* life expectancy, inflation, etc.  This is not true of hedonic

13

damages."); *Stokes*, 2014 WL 675820, at *5 ("[B]uilt-in, subjective flexibility renders Dr.

Smith's theory unfalsifiable and incapable of being independently tested, and limits the capacity

of any 'standards and controls,' should such exist, to guide his methodology."); *Estate of

DuBose*, 2002 WL 34408963, at *2 ("[T]here is no verifiable methodology.  The validity of the

results of the surveys cannot be verified because, by definition, it purports to measure an

intangible that is not amenable to analytical precision. . . .  In contrast to an expert in forensic

economics who can help juries assess the average life expectancy, the type of studies that

Johnson relied upon are pure speculation.") (internal citation omitted); *Saia*, 47 F. Supp.2d at

148 ("[T]he ability to verify a hypothesis is at the core of a court's inquiry.  Here . . ., there is

significant reason to doubt the testability of hedonic damage calculations based on Dr. Smith's

willingness-to-pay models."); *Hein*, 868 F. Supp. at 232 ("No . . . retrospective validation is

possible in Dr. Palfin's thesis of the valuation of hedonic damages.  Speculative assumptions

remain speculation.").

        Likewise, courts have held that the rate of error of this approach is unacceptably

large.  *Crespo v. City of Chicago*, No. 96 Civ. 2787, 1997 WL 537343, at *3 (N.D. Ill. Aug. 22,

1997) ("the rate of error may be quite large"); *Hein*, 868 F. Supp. at 233 ("potential rate of error"

is where value-of-life studies "are most vulnerable to criticism of their reliability.  Values for an

anonymous life have varied in these studies from $100,000 to $12,000,000.  A spread of this

magnitude not only admits the possibility of error, it casts serious doubt on the validity and

usefulness of the exercise.") (footnotes omitted); *Kurncz*, 166 F.R.D. at 389 (noting in

connection with rate-of-error factor that "[e]conomists' studies [on value of life] have varied

tremendously in their valuations").

In addition, although Mr. Smith's methodology has been subject to peer review and publication, it clearly has not gained widespread acceptance in the field of economics. *McGuire v. City of Santa Fe*, 954 F. Supp. 230, 232 (D. N.M. 1996) (explaining that economic and sociological foundations of hedonic damages have "been assailed as lacking any verifiable basis by respected economists."); *Kurncz*, 166 F.R.D. at 388 ("Mr. Smith's method has been subject to peer review and he is well published.  The peer review, however, has not led to general acceptance. . . ."); *Lujan*, 2008 WL 7489095, at *3 ("The controversy that exists among economists and others regarding the meaning and use of such studies does not indicate a general acceptance of such testimony in the relevant community."); *Stokes*, 2014 WL 675820, at *6 (survey of forensic economists indicated "overwhelming, negative response" to Mr. Smith's methodology, raising "strong doubts as to whether Dr. Smith's methodology can be termed 'generally accepted.'"); *Saia,* 47 F. Supp.2d at 149 ("the court questions whether Dr. Smith's theory meets the requirement of general acceptability."); *Hein*, 868 F. Supp. at 232-33 (noting that willingness-to-pay thesis for valuation of human life has been debated since its inception); *Anderson*, 538 N.W.2d at 742 ("there is 'no basic agreement among economists as to what elements ought to go in the life valuation.  There is no unanimity on which studies ought to be considered.'") (quoting *Mercado*, 756 F. Supp. at 1103).

In the instant case, Mr. Smith's willingness-to-pay approach suffers from all of the identical reliability defects discussed in the above-cited cases.  This Court too should rule that Mr. Smith's testimony on hedonic damages is unreliable.

> **c.** **Mr. Smith's Opinion On Hedonic Damages Would Not Be Helpful To The Jury Even If It Were Otherwise Admissible**

Even were the Court to conclude that Mr. Smith's opinion on hedonic damages is reliable, the opinion still should be excluded under Rule 702 because it would not "assist the trier

of fact." Fed. R. Evid. 702. Expert testimony does not assist the trier of fact if it simply addresses "lay matters which the jury is capable of understanding and deciding without the expert's help." *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir. 1999). In addition, the expert testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991)).

Court after court has held that the jury does not need expert testimony to decide the issue of hedonic damages, and some courts have further held that such expert testimony would improperly usurp the role of the jury. *See Lujan*, 2008 WL 7489095, at *2 (proposed expert testimony on hedonic damages "would not assist the jury, as the jurors themselves are fully capable of determining the value to be placed on the enjoyment of life. Indeed, any expert testimony attempting to quantify such damages invades the fact finder's domain. . . . Damages for loss of enjoyment of life are not capable of being determined by a formula.") (footnote and citation omitted); *Stokes*, 2014 WL 675820, at *6 ("[A] lay jury can competently assess the value of enjoyment of life. Dr. Smith's generalized discussion of hedonic damages would not further 'help the trier of fact' in this role and therefore is excluded under Rule 702".); *Saia*, 47 F. Supp.2d at 150 ("At bottom, the court believes that the qualitative and quantitative value of the loss of Saia's enjoyment of life, as it might be included in the pain and suffering he may have endured, can be calculated independently by the jury without the assistance, if not the confusion, of Dr. Smith's proffered testimony."); *Crespo*, 1997 WL 537343, at *3 ("We presently are of the opinion that the jury is able to decide for itself, without the assistance of an economics expert, the value that our society places on a human life."); *Montalvo*, 884 P.2d at 366 ("Testimony of

16

an economist would not aid the jury in making such measurements because an economist is no more expert at valuing the pleasure of life than the average juror."); *Anderson*, 538 N.W.2d at 744 ("Even assuming that there was agreement among economists or that Smith's process of valuation was scientific, there would still be a problem with such testimony because 'the consensus [would be] that of persons who are no more expert than are the jurors on the value of the lost pleasure of life.'") (quoting *Mercado*, 756 F. Supp. at 1103); *Sullivan*, 862 F. Supp. at 321 ("The court believes that a jury is capable of determining these losses from its own experiences and knowledge, and through testimony by Mr. Sullivan, and further concludes that the proffered testimony of Mr. Smith would improperly invade the province of the jury"); *Loth*, 70 Cal Rptr.2d at 578 ("No amount of expert testimony on the value of life could possibly help a jury decide that difficult question").

Likewise here, the jury does not require Mr. Smith's testimony to decide the issue of hedonic damages.

> **d.    Mr. Smith's Opinion Should Be Excluded Under Federal Rule Of Evidence 403**

Finally, Federal Rule of Evidence 403 also warrants exclusion of Mr. Smith's testimony.  Expert testimony may be excluded under Rule 403 "when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury."  *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550 (JFK), 2007 WL 2258688, at *6 (S.D.N.Y. Aug. 6, 2007).  "'Expert testimony can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'"  *Id.* (quoting *Daubert*, 509 U.S. at 595).  *Accord Arista Records*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) ("The Rule 403 inquiry is

17

particularly important in the context of expert testimony, 'given the unique weight such evidence may have in a jury's deliberations.'") (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)).

Several courts have held that expert testimony on hedonic damages is inadmissible under Rule 403. *Estate of DuBose*, 2002 WL 34408963, at *3 ("The court also agrees with defendants that the evidence should be excluded under Rule 403. . . . Johnson's testimony will require defendants to devote a time to dispute the methodology and opinions. Despite the minimal scientific value, there is a risk the jury will defer to the testimony simply because Johnson is called an 'expert.'") (internal citation omitted); *Kurncz,* 166 F.R.D. at 390 ("the Court does not believe the jurors would accept the method as much as they might latch onto the first expert figure lobbed their way," and much time would be wasted debating merits of approach); *Ayers*, 887 F. Supp.2d at 1061-64 (holding that Mr. Smith's testimony was inadmissible under Rules 702 and 403). The same is true here.

## 2.    Mr. Smith's Opinion On Lost Wages Is Based On Unrealistic Assumptions

The Second Circuit has explained that "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher*, 73 F.3d at 21.

Mr. Smith's lost wage analysis is based on his assumptions that, but for Defendants' alleged conduct, Plaintiff would have immediately started practicing medicine in New York in 2007, and would have earned amounts commensurate with the average physician in the United States. Yet, he made these assumptions without any consideration of Plaintiff's particular circumstances – *viz.*, her age, her medical school, her grades, or the fact that she already had failed her medical boards. Perhaps the best proof that Mr. Smith's assumptions were

speculative and unrealistic is that *even now* – some 10 years after the alleged events that gave rise to this action – Plaintiff *still* is not a practicing physician, in New York or anywhere else.

Courts in analogous circumstances have rejected lost wages expert testimony based on speculative and unsupported assumptions regarding future employment. *See, e.g.*, *Carroll v. United States*, 295 Fed.Appx. 382, 385 (2d Cir. Oct. 2, 2008) ("[T]he magistrate judge did not err in striking the testimony of Carroll's economic expert because it was based on the speculative assumption that Carroll would have worked as a physician's assistant"); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567-70 (D.C. Cir. 1993) (holding that the district court should have excluded expert testimony estimating decedent's lost future wages when expert assumed that decedent would have engaged in new types of employment, and there was insufficient support for such assumptions in record); *Lee v. City of Richmond, Va.*, No. 3:12 Civ. 471, 2014 WL 5092715, at **18-19 (E.D. Va. Sept. 30, 2014) (expert testimony on future lost wages was inadmissible when expert simply relied on national average earnings for decedent's age and education level without accounting for decedent's own unique history and circumstances).; *Brunker v. Schwan's Home Service, Inc.,* 2006 WL 5186489, at *3 (N.D. Ind. Oct. 23, 2006) (excluding economist's proffered testimony about lost wages and benefits when economist's basic conclusions were that plaintiff was employable in future and could have earned "a salary commensurate with the national mean earnings of all high school graduates," reasoning that these conclusions are "[a]t most ... straightforward comparisons of [plaintiff] to broad categories of the population," and did not account for plaintiff's "medical condition, education level, work experience, or the economics and employment statistics of the regional job market").

### 3.   There Is No Basis For Mr. Smith's Opinion That Plaintiff Is Entitled To Compensation For The Time She Spent On This Case

Nothing in the record suggests that Plaintiff otherwise would have been earning money during the time she claims she was tending to the situation arising out of her Tribeca mortgage.  As such, there is absolutely no factual basis for Mr. Smith's attempt to place a monetary value on the time Plaintiff spent on this situation.  Nor is there any legal support for the recoverability of such damages.  *See Anastasion v. Credit Serv. of Logan, Inc.*, No. 2:08 Civ. 180 (TS), 2011 WL 4826102, at *1 (D. Utah Oct. 5, 2011) (excluding Mr. Smith's expert testimony on this theory, reasoning: "Plaintiff has not cited to any case law that would support Plaintiff's recovery for the time she spent working on her own case. . . .  Therefore, the Court will grant Defendant's motion with respect to time spent working on her own case . . . .").

### 4.   Also Unrealistic Is Mr. Smith's Opinion Based On The Alleged Damage To Plaintiff's Credit

In assuming that Plaintiff could have obtained a less expensive car loan and had more "credit expectancy" in the absence of Defendants' alleged conduct, Mr. Smith astonishingly ignores the glaring problems that undisputedly already existed in her credit history *before she even dealt with Defendants.*  Under these circumstances, there can be no credible argument that Mr. Smith's opinions on these topics are reliable.

Furthermore, Mr. Smith's "credit expectancy" theory does not appear to be based on any principle of economics.  The First Circuit recently rejected Mr. Smith's credit expectancy theory as unsupportable.  *See Smith*, 732 F.3d at 68 ("Even assuming that [plaintiff] actually had the capacity to borrow . . . at the suggested rates, a proposition for which Dr. Smith cited no authority but himself, there was no evidence that [plaintiff] tried to or had the intention to borrow anything close to that amount during those five years.  The conclusion that [plaintiff] should nonetheless be compensated as if he had borrowed the maximum amount of 'available' credit in

20

year one at the high cost of 25% is unsupportable.  The disconnect between Dr. Smith's methodology and the facts of the case rendered the testimony unhelpful to the jury in determining [plaintiff's] actual damages.") (footnote omitted).  The same reasoning applies in this case.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion *in limine* to exclude the testimony of Plaintiff's proposed expert Stan V. Smith.

*/s/ Laura P. Wexler*
Laura P. Wexler
BALLARD SPAHR LLP
425 Park Avenue
New York, NY 10022

*Attorneys for Defendants*
*Franklin Credit Management Corporation*
*and Tribeca Lending Corp.*

Date:  January 9, 2015

Of Counsel:

Martin C. Bryce, Jr.
Joel E. Tasca
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of January, 2015, I have caused a true and correct copy of the foregoing Memorandum of Law in Support of Defendants' Motion *in Limine* to Preclude The Testimony of Plaintiff's Proposed Expert Stan V. Smith, the Notice of Defendants' Motion *in Limine*, and the Declaration of Martin C. Bryce, Jr. in support of each of Defendants' Motions *in Limine* to be served on the following via ECF transmission:

> Krishnan Shanker Chittur, Esquire
> CHITTUR & ASSOCIATES, P.C.
> Central Westchester Business Park
> 500 Executive Boulevard, Suite 305
> Ossining, NY  10562
>
> *Attorneys for Plaintiff Linda D. Crawford*

> /s/ Laura P. Wexler
> Laura P. Wexler