**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
LINDA D. CRAWFORD,

                                                         08 Civ 6293 (KMW)(FM)

                          Plaintiff,

                - against -

FRANKLIN CREDIT MANAGEMENT CORPORATION,
TRIBECA LENDING CORPORATION,
LENDERS FIRST CHOICE AGENCY, INC,
                           Defendants.
-----------------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION *IN LIMINE* TO PRECLUDE DR. STAN V. SMITH

Dated: Ossining, New York
       January 19, 2015

**Chittur & Associates, P.C.**
500 Executive Boulevard, Suite 305
Ossining, New York 10562
(914) 944-4400

Attorneys for Plaintiff Linda Crawford

TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Ms. Crawford is Entitled to Recover Damages on Which Dr. Smith Has Opined.  4

II.   Dr. Smith May Not Be Precluded From Testifying on Damages For Loss of
      Enjoyment of Life. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    New York Law Permits Such Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Dr. Smith's Testimony Is Admissible under Rule 702, Fed.R. Evid. and
            *Daubert*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Dr. Smith Has Specialized Knowledge Skill, Experience, Training,
                  And Education In Forensic Economics And Loss of Enjoyment of
                  Life Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Dr. Smith's Testimony Is Based On Reliable Methods. . . . . . . . . . . 6

            3.    Peer Review of Dr. Smith's Methodology Has Been Extensive. . . . . 8

            4.    Dr. Smith's Methodology Has Received General Acceptance In
                  The Field Of Economics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            6.    Dr. Smith's Testimony Is Essential to Achieving Consistent
                  Rational Awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            7.    Defendants Present No Evidence to Dispute the Widespread
                  Acceptance and Use of Dr. Smith's Methodology. . . . . . . . . . . . . . 12

            8.    Defendants' Cases Are Distinguishable, And In Any Event,
                  Unpersuasive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            9.    Defendants' Other Objections Go to the Weight, Not
                  Admissibility, And Are Issues for the Jury. . . . . . . . . . . . . . . . . . . 15

            10.   Defendants' *Daubert* Objections Are Misplaced. . . . . . . . . . . . . . . 18

III.  Dr. Smith's Opinion On Lost Wages is Proper. . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   Dr. Smith May Testify on the Value of Ms. Crawford's Time Spent Due to
      Defendants' Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.    Dr. Smith's Estimates For the Loss of Credit Expectancy Are Proper. . . . . . . . . .  25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

TABLE OF AUTHORITIES

<u>Cases</u>

*Anastasion v. Credit Serv. of Logan, Inc.*,
2011 WL 4826102, at *1 (D. Utah Oct. 5, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Banks ex rel. Banks v. Sunrise Hosp.*,
120 Nev. 822, 836-37 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18, 21 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brunker v. Schwan's Home Serv., Inc.*,
2006 WL 5186489, at *2 (N.D. Ind. Oct. 23, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Campbell v. Experian Info. Solutions, Inc.*,
No. 08-4217-CV-C-NKL, 2009 WL 3834125(W.D. Mo. Nov. 13, 2009). . . . . . . . . . . . . 17

*Carroll v. United States*,
295 F. App'x 382 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Case v. Town of Cicero*,
2013 WL 5645780, at *11 (N.D. Ill. Oct. 16, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cason-Merenda v. Detroit Med. Ctr.*,
2013 WL 1721651, at *11 (E.D. Mich. Apr. 22, 2013). . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Cole v. Hunter*,
2014 WL 7272608, at *4 (N.D. Tex. Dec. 22, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cornell v. 360 W. 51st St. Realty, LLC*,
22 N.Y.3d 762, 780 *reargument denied*, 23 N.Y.3d 996 (2014). . . . . . . . . . . . . . . . . . . 20

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Durmishi v. Nat'l Cas. Co.*,
720 F. Supp. 2d 862, 881 (E.D. Mich. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Farring v. Hartford Fire Insurance Company*,
No. 2:12-CV-479 JCM (PAL). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

i

*Frye v. US*
54 Ap. D.C. 46 (CA D.C. 1923). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gonzalez v. Bratton,*
147 F.Supp.2d 180, 211-212 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Grant, et al. v. Sears Roebuck & Co., et al.,*
Case No. 01-10300-NI, (Circuit Court for the County of Manistee, Michigan, 2001). . . 11

*Hart v. Rick's Cabaret Int'l, Inc.,*
2014 WL 6238175, at *16 (S.D.N.Y. Nov. 14, 2014), *motion to certify appeal denied,*
2014 WL 7183956 (S.D.N.Y. Dec. 17, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Humphrey v. Diamant Boart, Inc.,*
556 F. Supp. 2d 167, 173 (E.D.N.Y. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Nw. Airlines Corp. Antitrust Litig.,*
197 F.Supp.2d 908, 928–29 (E.D.Mich.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Urethane Antitrust Litig.,*
2012 WL 6681783, at *6 (D.Kan. Dec. 21, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re: Aluminum Phosphide Antitrust Litigation,*
893 F.Supp. 1497 (D. Kan. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Joy v. Bell Helicopter Textron, Inc.,*
999 F.2d 549, 569 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kumho Tire Co., Ltd., v. Carmichael,*
526 U.S. 137, 152 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

*Kurz v. Chase Manhattan Bank,*
273 F. Supp. 2d 474 (S.D.N.Y 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

*Lee v. City of Richmond,*
2014 WL 5092715, at *19 (E.D. Va. Sept. 30, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lee v. Overbey,*
No. 08 cv 02115 (U.S. Dist. Ct. W.D. Ark.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Makinen v. City of New York,*
2014 WL 5036747, at *15 (S.D.N.Y. Sept. 30, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McDougald v. Garber,*
73 N.Y.2d 246 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Miller UK Ltd. v. Caterpillar, Inc.,*
2013 WL 474380, at *2 (N.D. Ill. Feb. 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Odier v. Hoffman Sch. Of Martial Arts,*
2009 WL 3568712 (N.D. Ind. Oct. 27, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

*Pipitone v. Biomatrix, Inc.,*
288 F.3d 239, 250 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rawlings v. Dovenmuehle Mortgage, Inc.,*
64 F.Supp. 2d 1156 (M.D. Ala. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

*Sherrod v. Berry,*
827 F.2d 195, 206 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Smith v. Ingersoll,*
214 F.3d 1235 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20

*Smith v. Jenkins,*
732 F.3d 51 (1st Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.,*
925 F.Supp. 1247, 1252 (S.D. Ohio 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tellabs Operations, Inc. v. Fujitsu Ltd.,*
283 F.R.D. 374, 390 (N.D. Ill. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Bell,*
72 M.J. 543, 554 (A. Ct. Crim. App. 2013) *review denied*, (C.A.A.F. Sept. 25, 2013). . . 19

*United States v. Ebron,*
683 F.3d 105, 139 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Vazquez v. City of New York,*
2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Other Authorities</u>

Adam Smith, *The Wealth of Nations,* pp. 38-39 (E. Canaan Ed. 1937)(First Ed. 1776). . 7

Berla, Brookshire & Smith, *Hedonic Damages and Personal Injury:  A Conceptual*

*Approach*, 3(1) J. Foren. Econ. 1 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Economic Analysis of Law,* 1986, Little Brown & Co. 182-185 and *Tort Law*, 1982, Little Brown & Co., 120-126. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Economics,* Sixth Ed., David Colander, McGraw-Hill Irwin, 2006. . . . . . . . . . . . . . . . . 9

Fisher, Chestnut & Violette, *The Value of Reducing Risks of Death: A note On New Evidence,* 8 J. Pol'y Analysis & Mgmt. 87 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

G.R. Albrecht, *Hedonic Damages and Personal Injury: A Conceptual Approach,"* Vol. 5. No.2, Spring/Summer 1992.. . . . . . . . . . . . . . 10

Hammerers and Rees, *The Economics of Work and Pay*, Harper-Collins, 1993. . . . . . . . 9

King and Smith, *Computing Economic Loss in Cases of Wrongful Death*, the Rand Institute for Civil Justice, R-3549-ICJ, 1988. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National Consumer Law Center, *Truth In Lending* (7th Ed. 2010),§11.5.6.1.. . . . . . . . . . 4

S.V. Smith, *Hedonic Damages in the Courtroom Setting*, Journal of Forensic Economics, Vol. 3. No. 3, Fall 1990. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

T.R. Miller, *Journal of Forensic Economics,* Vol. 3, No. 3, Fall 1990, 17-39. . . . . . . . . . 8

Ted R. Miller, *Willingness to Pay Comes of Age*; *Will the System Survive?* Northwestern University Law Review Vol. 83, No. 4 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

W.K. Viscusi, 31 *Journal of Economic Literature*, 1912-46 (Dec. 1993). . . . . . . . . . . . . . 8

W.K. Viscusi, *The Econometric Basis for Estimates of the Value of Life*, Journal of Forensic Economics, Vol. 3, No 3, Fall 1990.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>PRELIMINARY STATEMENT</u>

Defendants do not dispute that Dr. Smith may properly testify about (a) excess costs; and (b) loss of equity, both of which were subjects of his updated opinion.  SX1[1], Smith Updated Opinion of October 27, 2014.  This memo is accordingly restricted to the other issues that Defendants raise.

Defendants have no dispute with Dr. Smith's qualification as an expert. Nevertheless, Defendants attempt to discredit Dr. Smith by arguing that his testimony has been "repeatedly excluded" by courts.  Not true; at least 215 courts all over the United States have specifically allowed Dr. Smith to explain to juries how to put a dollar value on the seemingly incalculable, *i.e.,* loss of enjoyment of life damages.  Smith Aff. As the Nevada federal court held while rejecting a similar motion, Dr. Smith's

> . . methodology determines conclusions through observations of large amounts of objective data, its reliability is not in doubt.
>
> Plaintiff correctly notes that Dr. Smith's work has been published in countless peer-reviewed academic journals, and that the particular theories he uses in this case are included in textbooks relied upon by numerous universities across the country. <u>While some economists disagree with Dr. Smith's conclusions, his methodology has a strong following in the field.</u>
>
> Defendant's claims that Dr. Smith's testimony would not assist the jury are unfounded.  <u>Without the assistance of an expert, the jury would be left to create a number as to the monetary value of plaintiff's hedonic damages without a basis in objective fact.</u> Defendant will have an opportunity to cross-examine Dr. Smith and

---

[1] "CX" refers to the exhibits to the accompanying affidavit of Krishnan S. Chittur, Esq., dated January 19, 2015 ("CA"); and
"DM" refers to Defendants' memorandum of law in support of motion to preclude Dr. Smith, dated January 9, 2015, dkt. 118; and
"SX1" refers to "Exhibit 1" to the accompanying affidavit of Dr. Stan V. Smith of January 15, 2015 ("SA").

present to the jury any errors in his methodology or failures in applying the particular facts of this case. The jury will be free to accept or reject Dr. Smith's conclusions as it sees fit.

CX1, *Farring v. Hartford Fire Insurance Company,* No. 2:12-CV-479 JCM (PAL) (D. Nev.) (Dkt. 77, Order of Mar. 14, 2014).

While some courts have disagreed,[2] this Court does not have to resolve the conflict among other courts.   Defendants have not provided a single expert's opinion challenging Dr. Smith's methodology or the widespread acceptance of such methodology by experts in forensic economics. The record in *this* case is undisputed that Dr. Smith's methodology is based upon reliable methods generally used by experts in economics, extensively peer-reviewed, widely accepted in the field, and otherwise proper.  Thus, in *this* case, on *this* record, Dr. Smith's opinion is admissible.

---

[2]As the Supreme Court of Nevada summarized:

> Awarding damages for hedonic losses appears to be a recent concept. The long-standing objection to such an award was the "fear of speculativeness and duplication."[] While the majority of jurisdictions recognize hedonic loss as a recoverable element of damages, the jurisdictions differ as to how hedonic loss should be presented and awarded. In particular, jurisdictions disagree as to whether an expert should be permitted to testify concerning the value of hedonic loss. Some jurisdictions will not permit an expert to testify concerning the value of a person's life on the grounds that the loss is subjective, that the damages are incapable of being accurately measured or that the methods used by experts to measure hedonic losses are unreliable.[] Other courts permit experts, such as economists, to testify concerning the value of hedonic loss,[] recognizing that the jury is ultimately responsible for computing  damages[] and that expert testimony will often assist the jury in making its determination.[]
> We agree with these latter jurisdictions.

*Banks ex rel. Banks v. Sunrise Hosp.*, 120 Nev. 822, 836-37 (2004) (case citations omitted).

As clear from the enclosed affirmations, numerous renowned economists support Dr. Smith's methodology, and several universities use - and have been using for over a decade - Dr. Smith's textbook in their curriculum. SX3.  The federal government has adopted the same methodology for the regulatory agencies.  SX7.  An expert does not require *universal* acceptance to warrant qualification; Dr. Smith's methodology for calculating loss of enjoyment of life damages is reliable and widely accepted in his field.

Finally, and perhaps most germane to the instant inquiry, Dr. Smith's testimony will aid the jury by providing helpful information about the relevant economic considerations that may go into the juries' ultimate conclusion regarding damages, something with which the average juror is simply not familiar.

Defendants also object to other components of Dr. Smith's opinion such as his estimate of loss of earnings and loss of credit expectancy.  However, as shown below, Defendants' objections are misconceived; those damages are permissible and the jury is entitled to consider them.

<u>ARGUMENT</u>

> Consistent with the overall design of the Federal Rules of Evidence and the plain language of Rule 401, the federal courts are unanimous in holding that the definition of relevant is expansive and inclusive . . The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry. . . As Dean McCormick has aptly phrased it, to be relevant, evidence need only be a brick, not a wall.

*Miller UK Ltd. v. Caterpillar, Inc.*, 2013 WL 474380, at *2 (N.D. Ill. Feb. 7, 2013) (citations omitted).  *Accord, Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 390 (N.D. Ill. 2012).

Hence, when assessing a *Daubert* motion, the fact that testimony may be

3

assailable does not mean it is inadmissible under Rule 702.  "It bears reminding that the trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002); *accord, Makinen v. City of New York*, 2014 WL 5036747, at *15 (S.D.N.Y. Sept. 30, 2014).

> Even after *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

*Cole v. Hunter*, 2014 WL 7272608, at *4 (N.D. Tex. Dec. 22, 2014).  *Accord, United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012).

I.   <u>Ms. Crawford is Entitled to Recover Damages on Which Dr. Smith Has Opined</u>

Defendants claim that under New York law, only "out of pocket" damages are recoverable for fraud claims, and hence, Dr. Smith's opinion is irrelevant in its entirety. Defendants err.

First, Defendants ignore Dr. Smith's opinions on excess costs and on loss of equity.  SX1.

Second, under her TILA claims, Ms. Crawford is entitled to "any actual damage sustained," 15 U.S.C. §1640(a)(1).  This includes damages for mental anguish and other items that Dr. Smith opines about.  National Consumer Law Center, *Truth In Lending* (7th Ed. 2010),§11.5.6.1; *Odier v. Hoffman Sch. Of Martial Arts*, 2009 WL 3568712 (N.D. Ind. Oct. 27, 2009); *Kurz v. Chase Manhattan Bank*, 273 F. Supp. 2d 474 (S.D.N.Y 2003); *Rawlings v. Dovenmuehle Mortgage, Inc.,* 64 F.Supp. 2d 1156 (M.D. Ala. 1999)

(RESPA).

Third, Defendants are wrong even on the fraud claim, as pointed out in our earlier memo, Dkt. 133.  The categories of damages that Dr. Smith has opined are direct or consequential damages, which naturally flow from Defendants' fraud and are recoverable.

II.    <u>Dr. Smith May Not Be Precluded From Testifying on Damages For Loss of Enjoyment of Life</u>

    A.    *New York Law Permits Such Damages*

*McDougald v. Garber*, 73 N.Y.2d 246 (1989) expressly upheld damages for loss of enjoyment of life, but simply barred that as a *separate*, additional ground for recovery where there was already a recovery for pain and suffering.  Here, Ms. Crawford seeks no recovery for "pain and suffering", and hence, no risk exists of double-counting damages, DM12 (*quoting McDougald*).

    B.    *Dr. Smith's Testimony Is Admissible under Rule 702, Fed.R. Evid. and Daubert*

        1.    <u>Dr. Smith Has Specialized Knowledge Skill, Experience, Training, And Education In Forensic Economics And Loss of Enjoyment of Life Damages</u>

Defendants have not and cannot dispute that Dr. Smith is a nationally recognized forensic economist who co-authored *the* textbook on "Economic/Hedonic Damages." He has a Master's and a Ph.D. in Economics from University of Chicago.  In addition, he has had extensive experience in advising institutional investors regarding economics and finance.

Dr. Smith is also the author of many economic articles that have appeared in economic peer review journals and law journals.  SX6.  He has served as an adjunct

Professor at DePaul University College of law.  SX1.

Dr. Smith's expert testimony on the value of enjoyment of life has been admitted into evidence at trial and/or has survived a motion *in limine* 215 times (as of January 6, 2015) nationwide.  SX4.

2.    <u>Dr. Smith's Testimony Is Based On Reliable Methods</u>

An award of loss of enjoyment of life damages requires the jury to make an economic decision.  As with every decision, it cannot be based on perfect knowledge but on the best evidence available.  Dr. Smith will provide the jury the economic evidence generated by 40 years of studies and analysis relevant to that decision. This literature has been published in economic journals of the highest renown by authors of the highest economic credentials.  SX1 at 10.  These results are near universally accepted as valid within the forensic economic field.  Also, in analyzing the potential impact to life or limb, this is the only methodology used by every federal regulatory agency.  The agencies regularly report to Congress using this methodology.  There is simply no other alternative methodology.

Most important, Dr. Smith will not tell the jury what amount to award Ms. Crawford or even that they should award her anything.  Rather, Dr. Smith will take the results of forty (40) years of literature, along with Ms. Crawford's own testimony as to her loss of enjoyment of life, and explain to the jury how to use the methodology as a tool to aid in reaching a conclusion regarding the amount of damages that *could* be awarded from an economic perspective.

Dr. Smith's calculations employ the "risk reduction" or "willingness-to-pay" methodology.  Historically, economists traditionally valued life under what was known

6

as the "human capital" ("HC") concept, which determined that the monetary value of a person's life is determined by the person's ability to earn money in the labor market. *See* Adam Smith, *The Wealth of Nations,* pp. 38-39 (E. Canaan Ed. 1937)(First Ed. 1776). *See also* Ted R. Miller, *Willingness to Pay Comes of Age*; *Will the System Survive?* 83(4) N.W. Law Rev. (1989). The historical HC approach to valuing lives has been widely criticized, especially over the last twenty years, because it places no value on lost *quality* of life, or pain and suffering. Additionally, the HC approach places a minimal or no value on the lives of retired persons, persons in nursing homes, and children, as these individuals' labor market production has either ended or has yet to begin.

In recent years, economists have approached valuation of human life not based on lost capital but on the amount that a person is willing to pay for a reduced probability of dying by examining markets for risk reduction. *See* Miller, *Willingness to Pay*, Northwestern University Law Review, *supra*. This "risk reduction value" also known as "willingness-to-pay" has become widely accepted among economists; in fact, having gained general acceptance in economics, this is presently considered the "conventional methodology" for establishing the value of human life. *See* Miller, *Willingness to Pay*, in Cost of Injury in the United State; a Report to Congress, pp. 101-09(1989); Fisher, Chestnut & Violette, *The Value of Reducing Risks of Death: A note On New Evidence,* 8 J. Pol'y Analysis & Mgmt. 87 (1989).

The "risk reduction value" primarily examines the amount of money people are willing to pay in order to reduce the chance of fatal injury or illness. Economists like Dr. Smith estimate these values based upon factors including: the extra wages employers

pay to induce people to take risky jobs; the demand and price for products that enhance health and safety; and empirical surveys that ask people about their willingness to invest money to enhance their health or safety. *See* Miller, *Willingness to Pay*, Report to Congress, *supra*. These risk reduction values are further based upon various economic studies that have been performed by government, private industry and academics and are obtained from a variety of statistically reliable sources to arrive at a value range for a statistically typical human life.

The risk reduction valuation methodology, therefore, incorporates both objective statistical information gathered from a variety of reliable sources, including the United States government, industry, and academic data calculations, and is then subjectively modified based on the circumstances of the individual Plaintiff to arrive at a value range of damages that would compensate the Plaintiff for his or her loss of enjoyment of life.

3.   Peer Review of Dr. Smith's Methodology Has Been Extensive.

Dr. Smith's methodology has been the subject of extraordinarily extensive peer review, with over 100 studies in peer-reviewed literature estimating the value of life. SX6. *See also* W.K. Viscusi, 31 *Journal of Economic Literature*, 1912-46 (Dec. 1993); T.R. Miller, 3(3) *Journal of Forensic Economics,* 17-39 (Fall 1990) (discussing the dozens of articles published in peer-reviewed economic journals). This methodology has been discussed and studied by well-respected economists for decades.

Most significant for present purposes, Defendants have presented *no* evidence to the contrary.

8

4.    <u>Dr. Smith's Methodology Has Received General Acceptance In The Field Of Economics</u>

Dr. Smith's methodology is and has been generally accepted in the field of economics for many years.  In fact, as stated by the prestigious and highly regarded "The Rand Corporation" in 1988, "[m]ost economists would agree that the willingness-to-pay methodology is the most conceptually appropriate criterion for establishing the value of life."  King and Smith, *Computing Economic Loss in Cases of Wrongful Death*, the Rand Institute for Civil Justice, R-3549-ICJ, 1988.

Economics courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide teach this methodology and it is discussed in widely-accepted textbooks such as *Economics,* Sixth Ed., David Colander, McGraw-Hill Irwin, 2006, which is the third most widely used textbook in college courses nationwide. *See* Hammerers and Rees, *The Economics of Work and Pay*, Harper-Collins, 1993. Judge Richard A. Posner, former Chief Justice of the U.S. Court of Appeals for the Seventh Circuit and Senior Lecturer at the University of Chicago Law School, details the value of life approach in his widely used textbooks, *Economic Analysis of Law,* 1986, Little Brown & Co. 182-185 and *Tort Law*, 1982, Little Brown & Co., 120-126.  SX3.

General acceptance is also demonstrated by publications in the peer-reviewed *Journal of Forensic Economics*, which is the primary journal in the field of forensic economics.  This journal has published numerous articles dealing with this methodology with respect to the value of life. *See, e.g.* W.K. Viscusi, *The Econometric Basis for Estimates of the Value of Life*, Journal of Forensic Economics, Vol. 3, No 3, Fall 1990, 61-70; S.V. Smith, *Hedonic Damages in the Courtroom Setting*, Journal of Forensic

9

Economics, Vol. 3. No. 3, Fall 1990; G.R. Albrecht, *Hedonic Damages and Personal Injury: A Conceptual Approach,"* Vol. 5. No.2, Spring/Summer 1992.  *See also* Exhibits to accompanying Smith Aff.

Standing alone, the broad acceptance and use of the value-of-life calculations used by Dr. Smith establishes the admissibility of his proffered testimony.

> 5.   Numerous Courts Have Allowed Dr. Smith's Testimony And/Or The Willingness-To-Pay Methodology.

While Defendants cite cases criticizing Dr. Smith's testimony and/or his methodology, they completely ignore that many other courts - 215 of them - have found Dr. Smith qualified to testify.  SX4 (list of cases).  In one of the early cases where Dr. Smith's qualifications were challenged, the Seventh Circuit Court of Appeals observed:

> The testimony of expert economist Stanley Smith was **invaluable** to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of [plaintiff's] life.

*Sherrod v. Berry*, 827 F.2d 195, 206 (7th Cir. 1987).

> 6.   Dr. Smith's Testimony Is Essential to Achieving Consistent Rational Awards

Defendants argue that Dr. Smith's testimony will not be helpful to the jury.  But absent expert testimony, jurors would be being asked to quantify intangible damages without any basis or framework in which to do so.  Without the assistance of Dr. Smith's testimony the jury will be forced to speculate as to an amount.  *Smith v. Ingersoll*, 214 F.3d 1235 (10th Cir. 2000), illustrates the danger in not providing the jury with this tool to aid in their calculations.  In that case, Dr. Smith was permitted to testify but was not permitted to provide his range of calculations.  As a result, the jury awarded over twenty

million in damages for a highway worker who had lost his leg.

The value of Dr. Smith's testimony in this regard was described by one court as follows:

> And I think what this – what Dr. Smith does, and there's no question that he certainly has the credentials as an economist, he has a theory that is – has some level of endorsement from no less than a Nobel Prize winning economist. And it certainly is discussed in literature, including peer review literature, and it seems to be accepted. But as I understand it, at least at this point, and I don't profess to be an expert in any way, what Dr. Smith seems to be saying is that his methodology is a methodology of coming up with a measurement of what our society in economic sense places on some of these things, and it's a range.
>
> And I am prepared to, and am, revisiting my earlier view, and I think this indeed might be helpful to – it would seem to be helpful to a jury. As Judge Kolenda says, we tell the jury there isn't any formula or precise way to compute noneconomic damages. But that, of course, noneconomic losses can be real and that therefore, the law permits compensation for them. And we tell the jury there are certain rules, however, that govern their computation of damages. One of the things we tell them is there computation cannot be speculative but must be based on the evidence presented at the trial. And Judge Kolenda goes on, every time I have gone to that passage in the Standard Jury Instructions, it has occurred to me that what I am in fact doing is telling the jury that they may not speculate, which, of course, is true, but that I'm telling them to go ahead and speculate because, of course, we don't have anything of record that really helps them decide.

SX5, *Grant, et al. v. Sears Roebuck & Co., et al.*, unreported, Case No. 01-10300-NI, in the Circuit Court for the County of Manistee, Michigan (2001). As stated in *Sherrod*, *supra*, Dr. Smith's testimony is "invaluable" to aid the jury in this complicated determination.

11

      7.    <u>Defendants Present No Evidence to Dispute the Widespread</u>
            <u>Acceptance and Use of Dr. Smith's Methodology</u>

Scores of courts have upheld Dr. Smith's opinion, and evidence of reduction in

value of life damages, admissible.  As the Arkansas federal court held

> . . Smith's methods are peer reviewed and the method has received
> sufficient general acceptance for admission.  Smith possesses
> specialized knowledge that can aid the trier of fact in determining
> compensation for the loss of life.  Smith has relied on sufficient facts
> and data for his opinion to be admissible.

SA5, *Lee v. Overbey*, No. 08 cv 02115 (U.S. Dist. Ct. W.D. Ark.) (Dkt. 93, order of July

31, 2009).

Defendants proffer no <u>evidence</u> to dispute this.  Defendants do not proffer a

single economist's opinion - reputed or otherwise - disputing widespread acceptance of

Dr. Smith's methodology or data.

Indeed, the record is undisputed that Dr. Smith is one of the foremost experts in

his field and that his methodology has been scrutinized and generally accepted by his

peers.

      8.    <u>Defendants' Cases Are Distinguishable, And In Any Event,</u>
            <u>Unpersuasive</u>

 Defendants seek to exclude Dr. Smith's testimony based on *Smith v. Jenkins*, 732

F.3d 51 (1st Cir. 2013), and some other cases which criticized Dr. Smith's methodology

and excluded his testimony.  There are numerous oddities in *Smith* which calls its

rationale into question.

First, "a Rule 104(a) pretrial evidentiary hearing is often necessary to address

*Daubert* issues," *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 173 (E.D.N.Y.

2008).  Such a hearing would permit presentation of all the relevant evidence.  However,

in *Smith*, the trial court did not hold a *Daubert* hearing, but simply denied that

defendants' motion to preclude without explanation.  As *Smith* noted, "the absence of

any findings or discussion on the record leaves us hard-pressed to conclude that the

district court adequately fulfilled its gatekeeping role in admitting Dr. Smith's

testimony," *Smith*, 732 F.3d at 65.

Second, while *Smith* - an appeals court - took it upon itself to make a *Daubert*

ruling without the benefit of the trial court's thinking, nothing suggests that the appeals

court considered the wealth of materials which are presented in this case.[3]

Third, *Smith* did not address whether *experts in Dr. Smith's field, i.e., forensic*

*economists,* consider Dr. Smith's methodology acceptable.  Instead, that Court ventured

its *own opinion* on that issue, and cited other courts, which, in turn, gave *their own*

*opinion* about Dr. Smith's methodology.[4]

But that is *not* the court's function under *Daubert*.  As Defendants themselves

acknowledge,

> The primary objective is "to make certain that an expert, whether
> basing testimony upon professional studies or personal experience,
> employs in the courtroom the same level of <u>intellectual rigor that</u>
> <u>characterizes the practice of an expert in the relevant field</u>."

DM8 (*quoting Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999).  As the

economist Dr. Beam stated:

> 2.      . . This methodology has been widely accepted and published
>         in the peer-reviewed economic literature for several decades
>         in economic journals of the highest quality.

---

[3]It is unclear whether such material was part of the record.

[4]That is akin to law professors making law by citing each other's law review articles.

    3.      From my personal knowledge, many of my fellow economists nationwide also testify in court as expert witnesses using this basic methodology.

SX7 (Beam Affidavit).

*Smith* voiced concerns which concerns are, and have been for about 20 years, the subject of discussion amongst economists.  But such concerns can be raised about any expert's methodology.  Indeed, such concerns have been acknowledged even by the government agencies, which nevertheless regularly use Dr. Smith's methodology.  SX7. But such concerns are properly subjects of cross-examination.  They go to the weight of the testimony.  If an expert's methodology was required to have undisputable assumptions, experts would rarely, if ever, qualify to testify.  It is routinely and properly left to the jury to determine whether to believe an expert and the weight to be given to the testimony. The conflicts among economists relating to Dr. Smith's methodology are of the same type and degree as the conflicts among economists regarding discount rate or work life expectancies.  As Dr. Franz states in his sworn statement:

    3.      There is consensus, although not uniformity, in the field of forensic economics that we can derive values for statistically average lives based on the scientific studies of the value of life reflected in "willingness to pay" literature. . .

SX7 (Franz Affidavit).

Fourth, while *Smith* acknowledged the decision in *Sherrod*, *supra*, where the Seventh Circuit found Dr. Smith's testimony to be "*invaluable* to the jury," *Smith* does not address or discuss *Sherrod*.  There is no explanation or any discussion of the court's drastic departure from the *Sherrod* opinion.

14

Multiple federal agencies rely upon the willingness-to-pay methodology and the "statistical life value" concept for valuing mortality risk reductions for governmental regulations.  SX7.  Thus, Dr. Stan Smith's testimony, dismissed by *Smith* and other courts venturing into forensic economics, is relied upon by the United States government in making policy determinations and regulations.

Moreover, while the general framework of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), applies to all expert testimony, courts should apply the *Daubert* factors with a clear understanding that they were devised specifically for "scientific" testimony, and that the *Daubert* analysis should be modified in the case of social science or other non-scientific expertise.  *See*, *e.g.*, *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F.Supp. 1247, 1252 (S.D. Ohio 1996); *In re: Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497 (D. Kan. 1995); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) (noting that the Federal Rules of Evidence allow district courts to admit a broader range of scientific testimony than would have been admissible under *Frye v. US* 54 Ap. D.C. 46 (CA D.C. 1923)).

### 9.   Defendants' Other Objections Go to the Weight, Not Admissibility, And Are Issues for the Jury

The function of an expert opinion is to assist the jury, nothing more.  As clear from the multitudinous orders of courts which found Dr. Smith's opinion admissible, Dr. Smith helps the jury place a dollar value on the intangible "loss of enjoyment".

Defendants argue that "humans are moved by more than monetary incentives," DM10 (quoting *Mercado*), and that consumer spending, salaries, and government budgeting might be motivated by several factors other than "how much life is worth," *id*.

15

Such objections can be raised against almost any attempt to quantify. For example, many lawyers are motivated by public service, and go on to public interest organizations or government service, while others go to lucrative jobs with big firms. Lawyers' earnings vary widely. Indeed, even within law firms, one lawyer may earn $25/hour while another would rake in the mid-seven figures. Nevertheless, courts routinely determine "reasonable" rates for attorneys' fees.

So also, Defendants attack Dr. Smith's opinion because it does not value the "life of the particular plaintiff," DM11. True, but what Dr. Smith does is give a frame of reference to the jury for quantifying the intangible, exactly as courts do with attorneys' fees.[5] *See, e.g., Gonzalez v. Bratton*, 147 F.Supp.2d 180, 211-212 (S.D.N.Y. 2001) (in 2001 that rates up to $390.00 an hour for senior attorneys are "within the range of reason" for "civil rights cases in this district" but at the "high end of the scale for a small firm").[6]

---

[5]For this reason, Defendants' criticism of Dr. Smith's selection of a benchmark value is also misconceived. We note that Dr. Smith's "benchmark" is $4.5 million in 2014 dollars, SX1 at 11. Defendants' reference to $4.1 million is from the earlier opinion which has been superceded, although the underlying methodology and rationale remain the same.

[6]*See also In re Nw. Airlines Corp. Antitrust Litig.*, 197 F.Supp.2d 908, 928–29 (E.D.Mich.2002) (denying motion in limine to exclude benchmarks under *Daubert*, noting that benchmarks need only be "somewhat comparable," not "wholly identical" because "certainty generally is unattainable"); *Cason–Merenda v. Detroit Med. Ctr.*, 2013 WL 1721651, at *6–12 (E.D.Mich. Apr. 22, 2013) (denying *Daubert* challenge to expert witness's selection of benchmark because the issue is one of weight not admissibility and cross-examination is available to identify any benchmark deficiencies); *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *6 (D.Kan. Dec. 21, 2012) (concluding claims of "possible taint" in benchmark chosen by expert "go to the weight of [expert's] opinions and not their admissibility").

Defendants then point out that Dr. Smith's methodology is improper here because this does not involve "death or personal injury."  Defendants confuse the *cause* for loss of enjoyment of life with the *value* of that loss.  The former is *not* the premise of Dr. Smith's opinion: he says nothing about *why* Ms. Crawford's enjoyment of life was impaired; he just opines about the effect.  Whatever be the cause - death, loss of limb, or, as here, theft of lifetime savings - the focus of Dr. Smith's testimony is the *value* of that loss.  Thus, for example, in *Campbell v. Experian Information Solutions, Inc.*, No. 08-4217-CV (W. D. Mo.), a case involving FCRA claims,[7] the Court denied a similar motion to preclude Dr. Smith from testifying on loss of enjoyment of life, observing:

> I'm going to deny the motion.  I'm going to permit this to be testified to.  I believe the jury can understand all of the points you make here.  And that if, in fact, this study is not appropriate and shouldn't be take into account, I think our jury will be able to understand that.

CX2, Tr of hearing in *Campbell*.

As Judge Furman observed under analogous circumstances:

> . . there is no basis to preclude Plaintiff's expert from testifying. Defendants' first two objections—to Signorelli's qualifications and the reliability of his methods and data—ultimately go to the weight of his testimony rather than to its admissibility. *See, e.g., McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). . . . [A]lthough Signorelli's opinions may not rest on statistical studies or traditional scientific methods . . they are . . "of a type reasonably relied upon by experts in various disciplines of social science." *Katt v. City of N.Y.*, 151 F.Supp.2d 313, 357 (S.D.N.Y.2001) (Lynch, J.) . . <u>Signorelli's weaknesses on these</u>

---

[7]*Cfr., Campbell v. Experian Info. Solutions, Inc.,* No. 08-4217-CV-C-NKL, 2009 WL 3834125(W.D. Mo. Nov. 13, 2009) (discussing the FCRA claims).

fronts are fair ground for cross-examination, but they are not a
basis for preclusion. *See, e.g., Cerbelli*, 2006 WL 2792755, at \*6; *see
also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,
presentation of contrary evidence, and careful instruction on the
burden of proof are the traditional and appropriate means of
attacking shaky but admissible evidence.").

*Vazquez v. City of New York*, 2014 WL 4388497, at \*12 (S.D.N.Y. Sept. 5, 2014).[8]

> 10.   Defendants' *Daubert* Objections Are Misplaced
>
> Although the four traditional Daubert factors for determining
> reliability—developed for scientific fields with publications and
> computed error rates, etc.—do not map easily onto the
> social-science context, the Supreme Court has held that these
> factors "neither necessarily nor exclusively appl[y] to all experts or
> in every case." *Kumho Tire*, 526 U.S. at 141, 153. Instead, the Court
> enjoys "broad latitude" in determining whether any such factors are
> "reasonable measures of reliability in a particular case." *Id.* at 153.
> The expert must satisfy the trial court that he "employs in the
> courtroom the same level of intellectual rigor that characterizes the
> practice of an expert in the relevant field," Id. at 152, and can do so
> by explaining not only what he did to reach his conclusion, but why
> and how he arrived at his result as well.

*Durmishi v. Nat'l Cas. Co.*, 720 F. Supp. 2d 862, 881 (E.D. Mich. 2010).

Defendants ignore this, arguing that the "willingness to pay" methodology is "not

testable," DM13.  However, as another Court explained, that criteria is inappropriate for

social science experts:

> . . both the Supreme Court and the Sixth Circuit have emphasized
> that the factors cited in *Daubert* "do not constitute a definitive
> checklist or test," and that "the Rule 702 inquiry [i]s a flexible one."
> *Kumho Tire*, 526 U.S. at 150; *see also In re Scrap Metal*, 527 F.3d
> at 529. More specifically, although a lack of testing may render an
> expert's opinion unreliable where the expert's theory "easily lends
> itself to testing and substantiation," *Dhillon v. Crown Controls
> Corp.*, 269 F.3d 865, 870 (7th Cir.2001), the courts have recognized
> that this *Daubert* factor may not apply as well, if at all, to the social

_____

[8]All emphasis in quotations are supplied unless specified otherwise.

> sciences, in which theories are less susceptible to "ideal
> experimental conditions and controls," *United States v. Simmons*,
> 470 F.3d 1115, 1123 (5th Cir.2006); *see also Isely v. Capuchin
> Province*, 877 F.Supp. 1055, 1065–66 (E.D.Mich.1995) (permitting
> a psychological expert to testify regarding repressed memory,
> despite the expert's acknowledgment that her theory of repressed
> memory "cannot be tested empirically"); *Voilas v. General Motors
> Corp.*, 73 F.Supp.2d 452, 461 (D.N.J.1999) (observing that outside
> the hard sciences, "theories are often not subject to testing or
> experimentation" (internal quotation marks and citation omitted)).

*Cason-Merenda v. Detroit Med. Ctr.*, 2013 WL 1721651, *11 (E.D. Mich. Apr. 22, 2013).

This is also true of Defendants' contention based on error rates. "[U]ndue reliance on this factor creates an analytical approach that will exclude virtually all expert testimony based on the social sciences. It is important to remember that while a 'court should consider the specific *Daubert* factors where they are reasonable measures of reliability,' *Kumho Tire Co.*, 526 U.S. at 138, each factor 'neither necessarily nor exclusively applies to all experts in every case,' *id*. at 141." *United States v. Bell*, 72 M.J. 543, 554 (A. Ct. Crim. App. 2013) *review denied*, (C.A.A.F. Sept. 25, 2013). As Dr. Riley, another forensic economist, explained, SX7 (Riley Aff.):

> 13.    Economics is often thought of as a science because what
> economists do is mathematical calculations.  This view,
> however, misstates the fundamental nature of economics.
> Economic calculations cannot be science in the sense of
> unchallengeable knowledge.  Mathematics, chemistry,
> physics, engineering and the like are less subject to the
> vagaries of human behavior. . . Hedonic calculations are
> certainly part of the accepted system of economic knowledge
> and such calculations help economists, citizens, jurors and
> attorneys understand how people value their lives and the
> lives of others.

So also, the fact that there is "no unanimity on which studies ought to be considered," DM15 (*quoting Anderson*, 538 N.W.2d at 742, and *Mercado*, 756 F. Supp.

19

At 1103) is irrelevant.  Indeed, if that were the criteria, no expert would ever testify in court.  As New York's highest court reiterated, "we have never insisted that the particular procedure be " 'unanimously indorsed' " by scientists rather than " 'generally acceptable as reliable,'" *Cornell v. 360 W. 51st St. Realty, LLC*, 22 N.Y.3d 762, 780 *reargument denied*, 23 N.Y.3d 996 (2014).

Defendants object that Dr. Smith's opinions value life, not *enjoyment* of life.  That is misconceived.  In economic literature, the two terms are considered synonymous.  *See, e.g.,* CX3 and articles attached thereto; *id.*, Berla, Brookshire & Smith, *Hedonic Damages and Personal Injury:  A Conceptual Approach*, 3(1) J. Foren. Econ. 1 (1990) ("This article describes a conceptual approach for applying estimates of the loss of the pleasure of life - estimates of 'hedonic damages' - to personal injury cases.").[9]  As one Court explained:

> Stan Smith did no more than explain his interpretation of the meaning of hedonic damages and offer four broad areas of human experience which he would consider in determining those damages. Importantly, Stan Smith made no attempt to apply the facts of this case to the criteria he proffered to the jury; the jury remained free to exercise its fact-finding function.

*Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000).  *Accord, Case v. Town of Cicero*, 2013 WL 5645780, at *11 (N.D. Ill. Oct. 16, 2013) (Dr. Smith's "testimony will help the jury carry out its fact-finding function to determine an appropriate measure of damages.").

---

[9]Cases cited by Defendants that drew this distinction, DM12, do not cite any economist or professional literature, but are simply bald assertions by those courts, illustrating the dangers of courts straying into unfamiliar professional areas.

III.   Dr. Smith's Opinion On Lost Wages is Proper

A district court has discretion under Federal Rule of Evidence 703 "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).  Further,

> Important here, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l RR Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002). "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Id. (citations omitted). "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.*

*Hart v. Rick's Cabaret Int'l, Inc.*, 2014 WL 6238175, at *16 (S.D.N.Y. Nov. 14, 2014), *motion to certify appeal denied*, 2014 WL 7183956 (S.D.N.Y. Dec. 17, 2014).[10]

Defendants contend that Dr. Smith made unrealistic assumptions about Ms. Crawford's earnings prospects.  He did not consider Ms. Crawford's circumstances, they say, such as her age and medical school, DM18, and that Ms. Crawford is not a licensed physician even today. *Id.*

What Defendants ignore is that despite her age - or maybe, because of it - Ms. Crawford's grades in the medical school were average (80%), and were progressively improving at the time that Defendants destroyed her dreams.  CX4, Crawford Dep. Tr.

---

[10]*Hart* involved an expert opinion, absent employer records, on the hours worked.  The Court found that his assumptions in "his damages model are conservative, and redound to defendants' benefit." *Id.*, *17.  That is what Dr. Smith has also done here; whether to accept a "conservative" number or not is upto the jury.

(May 17, 2010), at 31-32.  As a result of the stress and tension caused to her by Defendants' fraud - and the imminent loss of her entire life savings of about $400,000 in equity when she was at an age approaching retirement - she could not be reasonably expected to focus on the medical school studies; she even had to take a trimester off. <u>What is most important is that Ms. Crawford eventually picked up and graduated from medical school.</u>

    Further, directly due to Defendants' fraud, Ms. Crawford had to live a hand-to-mouth existence in the twilight years of her career - after having worked multiple jobs, paid all her dues and taxes, and lived by the rules.  She was left with no resources to pay for the test preparation courses, which are practically a must for foreign medical graduates seeking licensing in U.S.  Her failure to pass the licensing tests is directly due to that, for which Defendants were responsible.

    What is significant is that Ms. Crawford always passed her tests, including those for nursing, licensing for nurses, and medical school.  She did so in medical school too.  The only roadblock she was unable to overcome was the licensing test, and that was because she could not pay for the Kaplan test prep courses.  There can be no reasonable doubt that with the appropriate support, she would have been a licensed physician now.  Even today, Ms. Crawford continues to work as a nurse.  And she continues to save money to pay for the testing support she need so that one day - some day - she can be a licensed as a physician.  Her dream is still alive.

    Thus, Dr. Smith's assumptions were far from unrealistic as a matter of law.  Whether, in fact, that is realistic is for the jury.

22

Defendants' cases are distinguishable.  In *Carroll v. United States*, 295 F. App'x 382 (2d Cir. 2008), nothing suggests that *pro se* plaintiff was on track to become a physician's assistant.  Here, Ms. Crawford was in medical school, took time off, then went back and graduated; the consequences of Defendants' fraud, and destruction of her credit, precluded her from getting the guidance she needed to pass the licensing tests. In *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 569 (D.C. Cir. 1993), the expert "simply made up new lines of work for Mr. Joy" to estimate future earning capacity. That is not so here.  *Lee v. City of Richmond*, 2014 WL 5092715, at *19 (E.D. Va. Sept. 30, 2014), involved a police shooting victim, Fleming, who was a 22 year old "with a substantial criminal record" on probation under a suspended sentence, and facing serious criminal charges at the time.  Fleming was a high school dropout, had earned $9/hour, and was unemployed for at least 3 years.  The expert estimated Fleming's future earnings based on *nothing more* than national averages.  Worse, while Fleming had five children under five, he did not reside or pay any attention to them, but the expert assumed that he would spend "the national average of 21.91 hours per week performing services for his young children," *id*.  Not surprisingly, the court found such testimony "speculative and conjectural, based on unrealistic assumptions, and not the product of reliable methods and principles."  That is far removed from the case here: Ms. Crawford has been a highly productive member of society for decades, has held stable jobs, and had saved over $400,000 in equity.  Given her background, her initiative, and her persistence, the earnings estimates are far from unreasonable.[11]

---

[11]In *Brunker v. Schwan's Home Serv., Inc.*, 2006 WL 5186489, at *2 (N.D. Ind. Oct. 23, 2006), the expert offered "nothing more than conclusions unsupported by principles or

In sum, Ms. Crawford's commitment to her dreams, her academic record in nursing school, her licensing as a nurse, her academic record in medical school, her return to medical school, her continuing to work multiple jobs in order to save money to pay for the testing courses, are sufficient basis for the earnings forecast.  The jury should be able to determine whether her dreams of becoming a physician are realistic; those dreams should not be quashed by this Court in this manner.

IV.   <u>Dr. Smith May Testify on the Value of Ms. Crawford's Time Spent Due to Defendants' Fraud</u>

TILA permits recovery of damages for expenses incurred and time spent to rectify the consequences of Defendants' fraud and/or to mitigate damages.[12]  *See, e.g., Odier v. Hoffmann Sch. of Martial Arts, Inc.*, 2009 WL 3568712, at *2 (N.D. Ind. Oct. 27, 2009) ("Plaintiff missed at least five hours of work at a rate of $14.41 per hour. The Plaintiff paid several dollars for parking downtown in relation to this litigation."  Damages awarded).

In *Anastasion v. Credit Serv. of Logan, Inc.*, 2011 WL 4826102, at *1 (D. Utah Oct. 5, 2011), DM20, the Court disallowed time spent on the litigation itself, but specifically permitted such recovery "with respect to evidence regarding time spent disputing her credit reports."  Much of Ms. Crawford's time spent herein was similarly on mitigating damages, and for rectifying the consequences.

---

methodology."

[12]National Consumer Law Center, *Truth In Lending* (7th Ed. 2010),§11.5.6.1; *Odier v. Hoffman Sch. Of Martial Arts*, 2009 WL 3568712 (N.D. Ind. Oct. 27, 2009); *Kurz v. Chase Manhattan Bank*, 273 F. Supp. 2d 474 (S.D.N.Y 2003); *Rawlings v. Dovenmuehle Mortgage, Inc.,* 64 F.Supp. 2d 1156 (M.D. Ala. 1999) (RESPA)

V.     Dr. Smith's Estimates For the Loss of Credit Expectancy Are Proper

Defendants' rely upon the isolated *Smith* opinion to dispute this item.  However,

*Smith* does not address the basis of this item of damages.  As Dr. Smith stated, but for

Defendants' fraud,

> Ms. Crawford had the ability to borrow sums beyond her current
> lines of credit.  This standby expectancy has a value similar to the
> value of a safety net for a trapeze artist, or the value of a term life
> policy for a person who continues to live a healthy life - the value
> does not depend upon the actual use.

SX1 at 5.

Indeed, this item was specifically upheld by the very case cited by Defendants.

*Anastasion v. Credit Serv. of Logan, Inc.*, 2011 WL 4826102, at *1 (D. Utah Oct. 5, 2011)

(denying motion to preclude with respect to Dr. Smith's opinion on damages about "the

car loan, and Plaintiff's loss of credit expectancy").

CONCLUSION.

The more difficult something is to evaluate, the greater the need for expert

testimony to assist the jury in making its determination.  Expert economic testimony is

routinely admitted for evaluating businesses, real estate, and personal property.  Oddly,

the average juror likely is much more capable of evaluating those items than loss of

enjoyment of life.  Dr. Smith's methodology, the result of decades of research, is

routinely employed by economists to perform this calculation.  Defendants's objections

to Dr. Smith's testimony go to its weight, not admissibility.  Defendants may cross

examine him, present contrary evidence, and point the weaknesses of his opinions to the

jury.  Upholding admissibility here does not equate to a jury accepting his testimony.

Hence, the instant motion should be DENIED in its entirety.

Dated:  January 19, 2015
      Ossining, New York

Chittur & Associates, P.C.

By:    Krishnan S. Chittur, Esq.
Central Westchester Business Park
500 Executive Blvd Suite 305
Ossining, New York 10562
Tel: (914) 944-4400
Email: Kchittur@chittur.com

Attorneys for Plaintiff Linda Crawford

26